4 521
7 392
7* 712
11* 571
26*1118

EDWARD P. FERRY, RESPONDENT, v. JOHN L. STREET, APPELLANT.

SCHOOL SECTIONS—WHEN RESERVED.—Sections sixteen and thirty-six of the several townships of Utah Territory are not reserved from sale under the general land laws of the United States until such sections have been officially surveyed.

DECISION OF DEPARTMENT—CONCLUSIVE IN EJECTMENT.—The decision of the land department of the United States that land is non-mineral, or is unoccupied, is conclusive on the courts when a patent, issued in pursuance of such decision is collaterally attacked.

UNAPPROPRIATED—SQUATTERS NOT SEEKING TITLE.—The public lands of the United States are not appropriated simply by virtue of being occupied by squatters not seeking to obtain the Government title.

APPEAL from a judgment of the district court of the third district, and from an order refusing a new trial. The facts are fully stated in the opinion of the court on the rehearing.

Mr. Presley Denny, for appellant.

As to the first: Sections numbered 16 and 36 in each of the territories, etc., "Shall be reserved for the purpose of being applied to schools in the several territories, and in the states hereafter to be erected out of the same." Sec. 1946, Revised Statutes, Comp. Laws, p. 48.

In the Organic Act the language is, "it shall be, and the same are hereby reserved, for the purposes, etc." Sec. 13, Organic Act, p. 34.

In this case the patent being for lands on section 16, which were reserved from sale, and appropriated, was issued without authority of law, and the officers had no authority to issue the same.

It has always been the policy of the government to set aside sec. 16 of every township for the maintenance of public schools. The ordinance of 1787 being the first enactment: *Cooper* v. *Roberts*, 18 How., 177.

This suit was in ejectment for a part of section 16. The court say, plaintiff's case affirms, that this section had been *appropriated* to the State of Michigan for the use of schools: p. 176.

The *appropriation* of public lands, for that object, became a fundamental principle by the ordinance of 1787, which settled the terms of compact between the people and states of the northwestern territory, and the original states, *unalterable except by consent*: 18 How., 177; 21 Wal., 660, 670.

In *Ham* v. *State of Missouri*, 18 How., 126, the court in commenting upon the acts of March 6th, 1820, and July 19th, 1820, says, "that it amounts not merely to a grant for the use of schools, of the 16th section, but to a positive condition or mandate, so far as Congress can make it, for the dedication of those sections to that object:" p. 131.

"Such lands were *appropriated* to a *specific* and *permanent purpose*, and as to these lands, sales, and every other disposition, inconsistent with such dedication, were *expressly inhibited*." Id., 131, 132.

The instructions, given and refused in that case (p. 130), which the supreme court say, were correct, decide, that the various acts of Congress with reference to sec. 16, operate as a grant, for the use of schools, and that such reservation, attaches to *private* land claims which had previous to such donation, been claimed by individuals: See also *Kissel* v. *St. Louis Public Schools*, 18 How., 19; *Minnesota M. Co.* v. *The National M. Co.*, 11 Mich., 186; *Wilcox* v. *Jackson*, 13 Pet., 498; *Gaines* v. *Nicholson*, 9 How., 539.

In 11th Mich. above, the plaintiff who claimed a U. S. patent and selection made in 1845, insisted, that until the 16th section had been identified by survey of public

lands, the Federal Government had power to dispose of such lands.

The survey was not made until 1847. But the court says, "from the policy of the government it was never intended to authorize the sale by the United States of any lands, which *might fall within* sec. 16."

In *Kissel* v. *St. Louis Schools*, the act reserving certain lands was passed in 1812, they were not surveyed until 1840. The school lands were not *designated* until 1843, an entry was made in 1836, under the pre-emption laws of 1814 and 1816, yet the court held that such lands were *appropriated* and not subject to sale or entry: p. 27.

In the *United States* v. *Carpenter*, 111 U. S., 349. "The lands were reserved, the entry void. *It matters* not whether the lands had been *surveyed* or *not.*"

But these lands were surveyed and section 16 known when located with the scrip. The *northern line* of *section 16 had been run officially*. Section 9 and the tier of sections north, in the same township, had been surveyed and returned to the land office officially, and the whole section surveyed prior to location.

Where the United States agreed to grant a certain quantity of lands to be selected after the lands had been surveyed, but before they were surveyed or selected, the reservee deeded his interest, it was held, his title passed: *Doe* v. *Wilson*, 23 How., 457.

The language of the acts reserving sections 16 and 36 to the territory, effectually withdrew said lands from sale, and on the admission of the territory, it would become the owner absolutely: *Higging* v. *Houghton*, 25 Cal., 260; *Thompson* v. *True*, 48 Cal., 601.

The patent being for land reserved, was issued without authority of law, and void. The officer had no authority to grant it: *Patterson* v. *Winn*, 11 Wheat., 380; *United States* v. *Stone*, 3 Wall, 535; *Stoddard* v. *Chambers*, 2 How., 318; *Parker* v. *Duff*, 47 Cal., 554, 562.

And it is competent for the defendant, in an action of ejectment to attack the validity of the patent, on the ground that the land was excepted from the grant: *McLaughlin* v. *Heid*, 63 Cal., 208.

In the above case the defendant had not even preempted or filed upon the land, but as he had tried to, the supreme court said, he had sufficient interest to attack a patent.

It can be shown that lands are *swamp* in suits for possession, why not then that they are mineral lands: *Thornton* v. *Thurston*, 28 Cal., 603; *Kyles* v. *Tibbs*, 23 Cal., 432; *Robinson* v. *Forrest*, 29 Cal., 320.

The validity of a patent purporting to grant lands which the officers had no authority, may be controverted in any action directly or indirectly. The patent is void and defendant in ejectment may prove the facts showing its invalidity: *Carr* v. *Quigley*, 57 Cal., 394; *McLaughlin* v. *Heid*, 63 Cal., 208.

*Messrs. Sutherland & McBride*, and *Mr. Arthur Brown*, for respondent:

A patent not void on its face is evidence of a valid grant without further proof: *Bagnels* v. *Broderick*, 13 Pet., 450; *Grant* v. *Smith*, 26 Mich., 204; *Polk* v. *Wendel*, 9 Cranch, 87; *Clark* v. *Hall*, 19 Mich., 372; *Winter* v. *Cromelin*, 18 How., 88; *Smelting Co.* v. *Kemp*, 104 U. S., 639; *Darfer* v. *Plaisted*, 38 Cal., 80; *Steel* v. *Smelting Co.*, 106 U. S., 454; *Parleys Park M. Co.* v. *Kerr*, 3 Utah, p. 235.

It is conclusive against intruders, that is, against all persons who do not connect themselves with that source of title: *Smelting Co.* v. *Kemp*, 104 U. S., 640, 641.

A person who but for the patent is shown to own the land, may at law attack the patent on the ground that the officer making it had no power: *Sherman* v. *Buick*, 93 U. S., 216; *Smelting Co.* v. *Kemp*, 104 U. S., 646-7.

The defendant does not connect himself with the source of title, nor did he show, or offer to show any fact to affect the authority of the officers who issued the patent.

The act under which the patent issued is brought before the court by the reference to it in the patent. It authorized the location of the scrip on any vacant unappropriated land of the United States, not mineral, whether surveyed or unsurveyed.

The non-mineral character was a fact to be determined by the Land Department, and the determination is conclusive like a judgment: *Smelting Co.* v. *Kemp, supra.*

The only claim of the appellant in respect to a prior appropriation is the provision in the territorial acts of Congress looking to a future dedication of sections 16 and 36 to school purposes.

No present reservation or appropriation is declared: Sec. 15, Organic Act; sec. 1946, C. L. Utah, pp. 34, 48; *Heydenfeldt* v. *Gold etc. Co.*, 93 U. S., 634; Copp. Min. L., 105 et seq.

Until survey no such sections could be recognized in the Land Office. This scrip was located on this land while unsurveyed.

EMERSON, J.:

The form of this action is one for the possession of real estate, situated in the town of Park City. The plaintiff claims title under the patent of the United States, and by mesne conveyances to the plaintiff from the patentee. No question is made as to the existence of the patent, or the title deraigned therefrom in plaintiff; but in this action at law, for the recovery of possession, the defendant seeks to assail that patent, on the following grounds:

First. The premises, in truth, did describe a part of section 16, and that, therefore, they were not open to settlement, and the plaintiff and his grantor had no right to patent the same, for the reason that it was a school section, and the authorities were forbidden to patent the same to settlers.

Second. That the said lands were mineral lands, and, therefore, not open to claims of settlers.

Third. That the lands were occupied by people squatted thereon, and claiming to be a city, to-wit: Park City.

We will determine these three objections in their order. The plaintiff procures his title under the scrip known as Valentine scrip. The authority for the issuing of which is to be found under an act of Congress approved April 5, 1872, which authorizes the holders of such scrip to enter unappropriated lands of the United States, and

the first question involves the inquiry as to what is the meaning of appropriated or unappropriated. It is complained by the appellant that lands which may possibly fall in section 16 or 36, although not then surveyed, are appropriated. On the other hand, it is contended that the only appropriation of the lands which fall within sections 36 and 16, is when they are surveyed and found to be such sections by official survey; and until such survey, the lands are open for any appropriator, and a person seeking to pre-empt or to homestead on such lands has always to be recognized as one entitled to enter thereon, and his right has to be protected, although afterward the number of this section turned out to be 16 or 36. The Valentine scrip was not more limited. The holder of it had the right to enter upon any lands which had not been actually designated and set aside for the use of schools, or for the use of actual appropriators. These pre-emptors or people were not holding under homestead claims. These lands had never been pre-empted or made subject to homestead claims, nor had they been surveyed at the time when this patent was applied for. If under any assumed state of circumstances a patent can be valid, then it cannot be attacked in any collateral proceeding or in any manner except by direct action to set aside the deed indicated either by the United States, or the persons who have succeeded to its right. It is apparent that this patent not only could have been, but under the existing circumstances, was valid. It was not in the power of the defendant or appellant to attack that patent in a court of law on the ground that it included school lands. The law upon this subject is fully stated in the case of *Steel* v. *Smelting Co.*, 106 U. S., 454. "So with a patent for land of the United States, which is the result of the judgment upon the right of the patentee by that department of the government, to which the alienation of the public lands is confided, the remedy of the aggrieved party must be sought by him in a court of equity if he possesses such an equitable right to the premises as would give him the title if the patent were out of the way. If he occupy with respect to the land no such position as this, he

can only apply to the officers of the government to take
measures in its name to vacate the patent or limit its opera-
tion. It cannot be vacated or limited in proceedings when
it comes collaterally in question; it cannot be vacated or
limited by the officers themselves.

Their power over the land is ended when the patent is
issued and placed on the records of the department. The
other cases cited on both sides are in conformity with
this ruling. The determination of this first question de-
cides the other also. If these premises were mineral
lands as claimed by the appellant, and the appellant had
any right therein, it was his duty to have applied for a
patent and assert his right before the department. An
adjudication of the department of the land office upon
the subject is conclusive and final. It would be a strange
doctrine, if after the United States Government has
patented land away and minerals should be discovered in
the lands, within his patent or deed, that some outside dis-
coverer could say the patent was void. Such was not the
intention of the law. If it had been true that any mineral
entries had been made at the land office at the time this
patent was applied for, then such owners and the de-
fendant among them, if he were one, must have had
notice of the procedure, and the law assumes and presumes
he did have notice. If after inquiry the land office deter-
mined the plaintiff had or his grantors had, a right to a
patent, that decision was binding upon the court. The
same result must follow if no inquiry was entered into.
The land office had jurisdiction in the matter; its deter-
mination was final.

Precisely the same views control the third point. The
defendant offers to prove that there were, at the time of the
application of this Valentine scrip to the premises in ques-
tion, a few hundred squatters within the land conveyed.
Those squatters had taken no measures or steps to procure
title under the town site law, filed no papers in any tribunal
entitling them to act as such. If it was desired and within
the law to plat a town site entry they had ample oppor-
tunity. Until they did so they were trespassers, and the
lands were unappropriated, and it was open for the gov-

ernment to eject them: *Yosemite Case*, 15 Wall., 77. Until such act on the part of squatters, any person having the authority of the United States Government could deed the same. The grantor of the plaintiff holding the Valentine scrip had the authority of the United States Government. These lands at the time had been unappropriated in every sense of the term. They had not been even surveyed, and until they were surveyed no appropriation whatsoever had been made of them. The court concurs in the findings and the opinion of the court below.

ZANE, C. J., and TWISS, J., concurred.

A rehearing was granted in this case, and after the same had been reargued the following opinion was delivered in the June term, 1886:

ZANE, C. J.:

The case is now submitted on a rehearing. It is an action at law, commenced in the first district court, for the possession of two town lots in Park City, Summit county, Utah. The defendant answered, admitting possession, and alleging that the land, of which the lots in dispute were a part, was, at the time of its location, under the laws of the United States, occupied for the purposes of commerce and trade, and was also mineral land. On the trial of the cause the court below received in evidence a patent from the United States to one Fredrick A. Nims, the patentee, and a deed from him to the plaintiff. To their admission in evidence the defendant objected, and excepted.

The following is a copy of the patent:

*"The United States of America to all whom these Presents shall come, Greeting:* Whereas, in puruance of the act of Congress, April 5, 1882, entitled 'An act for the relief of Thomas B. Valentine,' there has been deposited in the general Land Office special certificate of location E 148, for forty acres, in favor of Thomas B. Valentine, with evidence that the same has been duly located upon the northeast quarter of the south-east quarter of section sixteen,

township two south, of range four east, in the district of lands subject to sale at Salt Lake City, Utah territory, containing forty acres, according to the official plat of the survey of said land returned to the general land office by the surveyor general; the said official certificate of location having been assigned by the said Thomas B. Valentine to Fredrick A. Nims, in whose favor said tract has been located: Now, know ye that there is therefore granted by the United States unto the said Fredrick A. Nims, as assignee as aforesaid, and to his heirs, the tract of land above described, to have and to hold the said tract of land, with the appurtenances thereof, unto the said Fredrick A. Nims, as assignee as aforesaid, and to his heirs and assigns, forever; subject to any agricultural, manufacturing, or other purposes, and rights to ditches and reservoirs used in connection with such water-rights as may be recognized and acknowledged by the local customs, laws, and decisions of courts and also subject to the right of the proprietor of a vein or lode to extract and remove his ore therefrom, should the same be found to penetrate or intersect the premises hereby granted, as provided by law.

"In testimony whereof, I, Ulysses S. Grant, President of the United States of America, have caused these letters to be patent, and the seal of the general land office to be hereto affixed.

[Seal of General Land Office.]

"Given under my hand at the city of Washington, the twenty-sixth day of February, in the year of our Lord one thousand eight hundred and seventy-seven, and of the independence of the United States the one hundred and first.

  By the President,      U. S. GRANT,
           By D. D. CONE, Secretary.

S. W. CLARKE, Recorder of the General Land Office.

This patent was located under an act of Congress entitled "An act for the relief of Thomas B. Valentine," approved April 5, 1872. It provided for the issuance of scrip to Valentine by the commissioner of the general land

office, and the location thereof by Valentine, or his legal representatives, on any "unoccupied or unappropriated public lands of the United States not mineral," etc., and the issuance of a patent therefor.

It appears from the record that on October 12, 1875, one Brooks, a civil engineer and deputy United States mineral surveyor, made a private survey of the land described in the patent, for Nims, the patentee; that on the same day Nims located the land by filing Valentine scrip with the register of the land office at Salt Lake City, and by leaving the same as payment therefor; that the land was not surveyed by the United States until August 25, 1876; that the land north had been surveyed by the government; and that therefrom the northeast and northwest corners of section 16 could be ascertained. Section 15 of "An act to establish a territorial government for Utah" provides "that when the lands in said territory shall be surveyed under the direction of the government of the United States preparatory to bringing the same into market, sections 16 and 36 in each township in said territory shall be, and the same are hereby, reserved for the purpose of being applied to schools," etc.: Comp. Laws, Utah, 1876, p. 34, and section 1946, Rev. St., U. S., provides that section 16 and 36 in each township in Utah, and other territories mentioned, shall be reserved for the purpose of being applied to schools, etc. Nothwithstanding, section 16, of which the land in dispute was a part, had not been surveyed at the time of the location relied upon in this case.

Did the above provisions of law vest the title to section 16 in the territory? Did they operate as an absolute reservation of the section for school purposes? Or did the legal right and title of sections 16 and 36 remain in the United States till they should be surveyed—bounded —until brought into existence as sections?

Until a survey there could be no townships, or sections 16 and 36. If the title and legal right to dispose of the land found by survey to constitute those sections continued in the federal government until surveyed, then the patent must be held valid in an action of ejectment.

Section 16, above quoted, declares that the sections mentioned "shall be, and the same are hereby, reserved when the lands in said territory shall be surveyed under the direction of the government," etc. This language indicates an intention to reserve when the lands shall be surveyed. It does not indicate a grant operating at once, and before the survey. The purpose of the reservation is expressed in the section—"for the purpose of being applied to schools in said territories, and in the states to be erected out of the same." No grant *in præsenti* is expressed. The lands are reserved for the purpose mentioned. The right and title remains in the government.

Section 2275, Rev. St., U. S., shows clearly that the understanding of Congress was that the title should not vest in the territory or state before the survey. It is: "Where settlements, with a view to pre-emption, have been made before the survey of the lands in the field, which are found to have been made on sections 16 or 36, those sections shall be subject to the pre-emption claim of such settler; and if they, or either of them, have been or shall be reserved or pledged for the use of schools or colleges in the state or territory in which the land lies, other lands of like quantity are appropriated in lieu of such as may be patented by pre-emptors, and other lands are also appropriated to compensate deficiencies for school purposes, where sections 16 or 36 are fractional in quantity, or where one or both are wanting, by reason of the township being fractional, or for any natural cause whatever."

When a person settles on the public lands with a view to pre-emption, this section gives him a right to the patent, notwithstanding the land turns out, when surveyed, to be section 16 or 36, or a part thereof. The title and the right to dispose thereof is regarded as in the United States till the survey. If not, why transfer it by patent to the pre-emptor? Those sections, or their equivalent, in other lands, are regarded as pledged for school purposes. The language of the law is "reserved or pledged." The term "reserved" is regarded as synonymous in meaning with "pledged." Nims having made his location before

the land was surveyed, the title was in the United States at that time, and his title under the patent relates to the time of the location.

The case of *Haydenfeldt* v. *Daney Gold and Silver Min. Co.*, 93 U. S., 634, has been cited. In that case the plaintiff claimed under a patent from the state of Nevada, and the defendant under a patent from the United States. The plaintiff assumed that sections 16 and 36, whether surveyed or unsurveyed, were granted to Nevada for the support of schools. The language of the Act of Congress was "that sections numbered 16 and 36, in every township, shall be, and are hereby, granted to said state for the support of common schools." The court said: "The defendant, and those under whom it claims, occupied the land prior to the survey, and were entitled to purchase. The patent subsequently obtained from the United States relates back to the time of the original location and entry, and perfects their right to the exclusion of all adverse intervening claims;" and held that until the *status* of the land was fixed by a survey, and they were capable of identification, Congress reserved absolute power over them.

The defendant relied upon the case of *Cooper* v. *Roberts*, 18 How., 173. The land in dispute was a portion of section 16, which plaintiff affirmed had been appropriated by the United States to the state of Michigan for the use of schools, and his claim depended on the validity of a patent from that state issued in November, 1851. The defendant's right depended on a patent from the United States issued in 1852. The land was surveyed in 1847. The Act of Congress admitting the state of Michigan to the Union contained the following provision: "That every section No. 16, in every township of the public lands, and, when such section has been sold or otherwise disposed of, other lands equivalent thereto, and as contiguous as may be, shall be granted to the state for the use of schools." The court said: "We agree that until the survey of the township, and the designation of the specific section, the right of the state vests in compact, binding, it is true, the public faith, and dependent for execution upon the political authorities. Courts of justice have no authority to

mark out and define the land which shall be subject to the grant. But when the political authorities have performed this duty, the compact has an object upon which it can attach, and if there is no legal impediment the title of the state becomes a legal title. The *jus ad rem*, by the performance of that executive act, becomes a *jus in re*, judicial in its nature, and under the cognizance and protection of the judicial authorities as well as the others." The court held, in effect, that until the survey a simple obligation rested on the federal government, and when the survey was made the state acquired a right to the particular land. The *jus ad rem* then became a *jus in re;* that until the survey the right of the state vested in compact, and at that time it vested in the state.

The case of *Kissell* v. *St. Louis Public Schools*, relied upon by appellant, was a contention about certain town or village lots reserved by an Act of Congress passed in 1812 for the support of schools. On the twenty-seventh of January, 1831, another act of Congress was passed for the purpose of transferring the title of the United States (if any) remaining in the lots to the several towns and villages embraced by the act of 1812. The court held that the act of 1831 vested the title to the lands in dispute in the city of St. Louis. These lots had been so surveyed and known that they could be identified. Duncan, through whom the appellant claimed, did not enter the land till 1836, and the United States having parted with its title in 1831, such entry was void: *Kissell* v. *St. Louis Public Schools*, 18 How., 19. By the twelfth section of an Act of Congress passed March 3, 1803, entitled 'An act regulating the grants of land, and providing for the disposal of the lands of the United States south of the state of Tennessee,' the sixteenth section in each township was reserved and appropriated to the support of schools. Referring to the provision, the court said: "The state of Mississippi acquired a right to every sixteenth section by virtue of these acts, on the extinguishment of the Indian right of occupation, the title to which, in respect to the particular section, became vested (if vested at all) as soon as the surveys were made and the sections designated. No patent

was necessary, or is ever issued, for these school sections:"
*Gaines* v. *Nicholson,* 9 How., 361.

On the trial of this case in the court below the defendant offered to prove that the land in dispute was in Park City, and its population at the time of the location, and that the land was then occupied as a town-site, and that the same was mineral land. To this evidence an objection was interposed by the plaintiff, which was sustained by the court. This ruling of the court the respondent assigned as error. Was it competent for the defendant to prove as a defense that the land was mineral, or that it was occupied as a town-site? Was the patent conclusive of such facts in an action of ejectment?

The acts of Congress authorized the location of Valentine scrip on any of the public lands unoccupied and unappropriated, and not mineral, whether surveyed or unsurveyed. Whether the land belonged to that class termed "mineral land," or was occupied as a town-site, were questions of fact to be determined by the land department before issuing the patent. Such determination could only be made upon evidence. The officers of the land department constitute a tribunal to determine such issues of fact, and when decided the decision is conclusive in an action at law. The lands in dispute were the public property of the United States at the time of the location upon which the patent in question was issued. They had not been reserved from sale. They were in no reservation made by law, and the law under which the location was made authorized the same. The act authorizing the location of Valentine scrip did not limit the right to public land of the description mentioned outside of town-sites. But if it were conceded that other statutes did make the limitation, then the question as to whether the land, or any portion of it, was a town-site—whether it was settled upon and occupied as such—was a question of fact. This question, as well as the mineral qualities and character of the land, was for the land department to determine upon evidence. This is not the case of a city with boundaries fixed by law, and recognized as such. The purpose of the evidence was to show that the land in dispute was occupied

by a portion of the residents in Park City; that houses were situated upon it in which people were living; and that the same were in such proximity as to constitute a portion of the town. The mineral characteristics of the land the defendant proposed to show by persons familiar with mineral lands, and that there were such prospects upon it.

In the case of *Smelting Co.* v. *Kemp*, the court said, speaking of the effect of the action of the officers of the land department of the United States: "In the course of their duty the officers of that department are constantly called upon to hear the testimony as to matters presented for their consideration, and to pass upon its competency, credibility, and weight. In that respect they exercise a judicial function, and therefore it has been held in various instances by this court that their judgment, as to matters of fact properly determined by them, is conclusive, when brought to notice in a collateral proceeding. Their judgment in such cases is, like that of other special tribunals upon matters within their exclusive jurisdiction, unassailable except by a direct proceeding for its correction or annulment." Further along, in the same opinion, the court said, speaking of the presumptions attending the issuance of a patent: "If in issuing a patent its officers took mistaken views of the law, or drew erroneous conclusions from the evidence, or acted from imperfect views of their duty, or even from corrupt motives, a court of law can afford no remedy to a party alleging that he is thereby aggrieved. He must resort to a court of equity for relief, and even there his complaint cannot be heard unless he connect himself with the original source of title, so as to be able to aver that his rights are injuriously affected by the existence of the patent; and he must possess such equities as will control the legal title in the patentee's hands:" *Smelting Co.* v. *Kemp*, 104 U. S., 636.

In the case of *Steel* v. *Smelting Co.*, 106 U. S., 447, referring to the land department of the United States, the court said: "That department, as we have repeatedly said, was established to supervise the various proceedings whereby a conveyance of the title from the United States to portions of the public domain is obtained, and to see

that the requirements of different acts of Congress are
fully complied with.   Necessarily, therefore, it must con-
sider and pass upon the qualifications of the applicant,
the acts he has performed to secure the title, the nature of
the land, and whether it is of the class which is open to
sale.   Its judgment upon these matters is that of a special
tribunal, and is unassailable, except by direct proceedings
for its annulment or limitation.   Such has been the uni-
form language of this court in repeated decisions."

The respondent cited the case of *Morton* v. *Nebraska*,
21 Wall., 660.   In that case the plaintiff claimed from the
United States title to 320 acres of salt lands situated in
Nebraska, under locations of military county land war-
rants, upon which patents had been issued.   The state
based its title on an alleged grant from the United States
by virtue of certain statutes reserving salt springs and
salines for the use of the state.   In its opinion the court
attached importance to the fact that the lands had been
surveyed before location, and the salines noted on the field
books, though the notations were not transferred to the
register's general plats; and also to the fact that their
saline character was palpable to the eye.   The court re-
marked that "they resembled snow-covered lakes."   The
notes on the field books, and the saline on their surface,
indicated their boundaries.   They could be thereby iden-
tified.   If so, the title passed to Nebraska before the
plaintiff's location, and therefore the patents must have
been void.

*U. S.* v. *Carpenter* was a suit in equity to vacate a
patent of the United States issued to one August Chien-
son to a quarter section of land, a part of the Red Pipe-
stone quarry, in the county of Pipestone, in the state of
Minnesota.   The court held that, by treaty between the
United States and the Yankton tribe of Sioux or Dacotah
Indians, the whole of the reservation, embracing the
quarry, was withdrawn from private entry or appropriation
at the time of the location, and that the entry was there-
fore void.   This reservation was bounded and recognized:
*U. S.* v. *Carpenter*, 111 U. S., 347.

The decisions of the supreme court of the United States

establish the following propositions of law: *First.* That the various acts of Congress mentioned reserving portions of the public lands of the United States to the territories or states for the benefit of their people, vest the title of such lands so reserved in the territories or states when the lands are surveyed, or when they are bounded and ascertained. Until such time the obligation is executory, and the title remains in the federal government. *Second.* If the officers of the land department had no authority to issue the patent, for the reason that there was no law authorizing the sale of the land, or that it had been reserved from sale (being identified), or that the title was not in the United States, the patent is void. *Third.* As to all questions of fact which the land department is called upon to consider and pass upon before issuing the patent, the judgment of that department is unassailable, except in a direct proceeding for its annulment. *Fourth.* Among the questions the land department is called upon to consider is the character of the land, and the class to which it belongs, whether agricultural or mineral, or whether it is within a town-site. *Fifth.* If the land department had jurisdiction, the law conclusively presumes, in a collateral proceeding, the existence of all circumstances essential to the validity of the patent. Unless the patent is void, in view of the law, or the circumstances which the court may take judicial notice of, it must be held valid. All other essential circumstances must be presumed to have existed.

The views expressed in this opinion find support in the following cases, as well as in those above referred to: *Johnson* v. *Towsley*, 13 Wall., 72; *Polk's Lessee* v. *Wendal*, 9 Cranch, 87; *Wilcox* v. *Jackson*, 13 Pet., 498.

Upon a careful consideration of the whole case, we find no error. The judgment of the court below is therefore affirmed.

POWERS, J., concurred. BOREMAN, J., having been of counsel, took no part in the decision of this case.